## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ABEDALHAMEED M. ABUHAJEB, ABDELLATIF M. ABUHAJEB, SARA M. ABUHAJEB, SARA M. ABUHAJEB, and OSAMA M. ABUHAJEB  **Plaintiffs,**  v.  MICHAEL R. POMPEO, Secretary of State; DONALD J. TRUMP, President of the United States; JONATHAN ROLBIN, Director of Legal Affairs and Law Enforcement Liaison/Consular Affairs – Passport; CARL RISCH, Assistant Secretary of State for Consular Affairs; M. KELLY CULLUM, Consular Officer, American Citizen Services, U.S. Embassy, Amman, Jordan,  **Defendants.** | **CIVIL ACTION NO.  20-10340-TSH** |

### ORDER AND MEMORANDUM ON DEFENDANTS' MOTION TO DISMISS (Docket No. 13)

**MARCH 31, 2021**

**HILLMAN, D.J.**

Abedalhameed M. Abuhajeb, Abdellatif M. Abuhajeb, Safa M. Abuhajeb, Sara M. Abuhajeb, and Osama M. Abuhajeb (the "Abuhajeb Siblings" or "Siblings") filed this action against the Secretary of State, the President of the United States, and various State Department officers and agents regarding the revocation of their U.S. passports in August 2019.  The Abuhajeb Siblings allege that the State Department's actions violated their rights under 8 U.S.C. § 1503 (the Declaration of Citizenship Act), 5 U.S.C. § 704 (the Administrative Procedure Act), and the First

and Fifth Amendments of the U.S. Constitution. (Docket No. 1). They also ask that the Court reverse the revocation and declare the Siblings to be U.S. citizens. The Government moves to dismiss all claims. (Docket No. 13). For the following reasons, the Court **_GRANTS_** the motion.

### Background[1]

The Abuhajeb Siblings were born in Jordan. Their father, Mousa Abuhajeb, immigrated to the United States as a student in 1984, adjusted his status to lawful permanent resident in 1995, and became a naturalized U.S. citizen in 1999.

In 2004, Mr. Abuhajeb petitioned the U.S. Embassy in Jordan for immigrant visas for his five children. The embassy granted his petition, and on or about January 23, 2005, the Siblings, then all under the age of 18, lawfully entered the United States as legal permanent residents in their father's custody. Four days after later, their parents applied for U.S. passports for the Siblings.

On January 28, 2005, the State Department Boston Passport Agency issued passports to the Siblings in recognition that they had derived citizenship from their father, a naturalized citizen, under the Child Citizenship Act ("CCA"). The Act provides that children who are born outside the United States to at least one U.S. citizen parent automatically acquire citizenship if they are under the age of 18 and "[are] resid[ing] in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence." 8 U.S.C. § 1431(a) (Immigration and Nationality Act § 320).

---

[1]     The following facts are taken from the Siblings' Complaint (Docket No. 1) and assumed true for the purposes of this motion.

The Siblings returned to Jordan on February 6, 2005, approximately 15 days after their arrival.  None of the Siblings returned to the United States before their eighteenth birthday.  Now adults, two of the five siblings live in the United States. Until 2019, all the Siblings renewed their U.S. passports when required to do so without issue.

In 2019, Sara, one of the siblings living abroad, visited the U.S. Embassy in Jordan to renew the passports of her three children, who were born in the United States. This visit triggered the immediate revocation of all the Siblings' passports.  On August 19 and August 27, 2019, the State Department issued five letters revoking the Siblings' U.S. passports under 22 C.F.R. § 51.62(a)(2) as "erroneously issued."[2]  The letters stated that none of the Siblings were entitled to hold U.S. passports because they had not obtained U.S. citizenship under the CCA before turning 18.  According to the State Department, the Siblings' 15-day stay in Massachusetts in 2005 did not meet the CCA's requirement that foreign-born children of U.S. citizens applying for U.S. citizenship are "residing in" the United States or had resided there at some point before their eighteenth birthday.

On November 24, 2019, Abdellatif visited the U.S. Embassy in Jordan to obtain proof of U.S. citizenship for his second child, who was born in Jordan.  A consular officer told Abdellatif that "he was no longer a U.S. citizen and that the law was not clear on how long a lawful permanent resident had to be in the United States to derive citizenship from a parent under 8 U.S.C. § 1431."  The office denied proof of citizenship for Abdellatif's child, confiscated Abdellatif's passport, and told him "that many other people were in the same situation as Abdellatif, i.e., had their U.S. passports revoked."

---

[2] 22 C.F.R. § 51.62 authorizes the State Department to revoke a passport which was "erroneously obtained from the Department" or "when the Department has determined that the bearer of the passport is not a U.S. national."

Abdellatif requested a hearing, which was held at the U.S. Embassy in Jordan on February 12, 2020.  Abdellatif argued that neither the CCA nor the State Department's Foreign Affairs Manual ("FAM") require a specific period of physical presence before citizenship can be derived, that the Department's abrupt reinterpretation of the CCA was arbitrary, and that U.S. citizenship cannot be involuntarily taken away without a voluntary renunciation.  The hearing officer upheld the revocation, agreeing with Abdellatif that the CCA and the FAM do not require a specific period of physical presence but finding that the State Department correctly applied other provisions of the FAM which direct consular officers to scrutinize the length and character of a CCA claimant's stay to determine whether the child "is residing" or had resided in the United States before reaching eighteen years of age.  (Docket No. 19-1 at 3-7).  On June 14, 2020, the State Department sent Abdellatif a final decision letter upholding the revocation of his passport.  (Docket 19-1 at 2).

The Abuhajeb Siblings filed the instant complaint for violations of their statutory rights and their constitutional rights under the First and Fifth Amendments.  They also brought a sixth claim for equitable estoppel. (Docket No. 1).  The United States has moved to dismiss all claims under Fed. R. Civ. P. 12(b)(6).  (Docket No. 13).

## Legal Standard

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Langadinos v. Am. Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir. 2000).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[A]

4

plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 13 (1st Cir. 2011). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

### The Child Citizenship Act

The Child Citizenship Act ("CCA"), which is codified at § 320 of the Immigration and Nationality Act ("INA"), provides that:

> **"(a) In general**
> A child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled:
> > **(1)** At least one parent of the child is a citizen of the United States, whether by birth or naturalization.
> > **(2)** The child is under the age of eighteen years.
> > **(3)** The child **is residing in the United States** in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence."
>
> 8 U.S.C. § 1431(a) (*emphasis added*).

Whether the Siblings automatically attained citizenship and were thus entitled to hold U.S. passports depends on whether their 15-day stay in the United States in 2005 satisfies the (a)(3) requirement that they "resided" in the United States before the age of 18. The CCA does not define "residing," but § 1101 of the INA defines residence as "the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent." 8 U.S.C. § 1101(a)(33).

The State Department Foreign Affairs Manual (FAM) provides detailed guidance on how consular officers should determine whether a person claiming to have automatically attained citizenship pursuant to the CCA satisfied the statute's residency requirement before they reached eighteen years of age:

- "Determining whether a person is/has resided in the United States typically entails analysis of both the character and duration of the stay."
- "Each case must be considered on its own merits.  In general, the longer the duration of the stay, the less need there is to analyze the character of the stay.  Thus, for example, a stay in the United States of less than three months might not constitute 'residing in the United States' in the absence of additional evidence. A stay of three to six months might qualify . . . depending upon its character, but, again, supporting evidence may be required. A stay in excess of six months generally would qualify as 'residing in the United States.'"
- In some cases, a stay of a short duration [such as a child attending boarding school abroad or a child with divorced parents in separate countries sharing custody] will, because of its character, meet the 'is residing in' requirement."

8 FAM 301.10-2(F)-(F)(2)

On October 4, 2013, the Secretary of State sent a cable to all consular posts directing officers to apply the analysis in the FAM to determine whether a child was or is residing in the United States for purposes of the CCA.  (Docket No. 15-1 at 1).  It added that "[m]ere entry into the United States or a temporary visit—even if on an immigrant visa—does not meet the 'residing in the United States' requirement of INA 320(a)(3).; therefore, unless there are other facts establishing that the child resided in or continues to reside in the United States, he/she would not acquire U.S. citizenship upon entry."  (*Id*. at 2).

The 2013 Cable and the FAM guidance directing consular officers to make residency determinations for purposes of the CCA by considering the duration and character of a

claimant's stay in the United States were both in force in 2019, when the State Department revoked the Siblings' passports.

### **The Siblings' Statutory Claims**

Count I: The Administrative Procedure Act

The Administrative Procedure Act ("APA") provides a mechanism for persons "suffering legal wrong because of agency action, or [who are] affected or aggrieved by agency action within the meaning of a relevant statute" to seek judicial review.  5 U.S.C. § 704.  It empowers federal courts to reverse final agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or which are "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

The Abuhajeb Siblings claim that the State Department violated the APA when it revoked passports which they had lawfully obtained in 2005 under the CCA, a statute which confers automatic U.S. citizenship on children born outside the United States who meet three criteria: the child 1) has at least one U.S. citizen parent; 2) is under the age of 18; and 3) is/has resided in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence. 8 U.S.C. § 1431(a).

Federal courts may only review an APA claim if there is "no other adequate remedy in a court." 5 U.S.C. § 704; *Garcia v. Vilsack*, 563 F.32d 519, 522 (D.C. Cir. 2009).  The APA generally precludes review where Congress has provided a "special and adequate review procedure," but courts can hear APA claims where that review procedure provides "doubtful and limited relief" or relief which is not of "the same genre." *Bowen* at 901, 904; *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1272 (D.C. Cir. 2005).

The Government claims that the Court has no jurisdiction to hear the Siblings' APA claims because the INA provides an adequate remedy at law at 8 U.S.C. § 1503 for all individuals who have claimed and been denied a right or privilege of a national of the United States, whether they are inside or outside the United States. Under § 1503(a), any *individual in the United States* who has been denied such a right or privilege may sue in the district court for the district in which the person resides for a declaratory judgment declaring her to be a U.S. national.

Plaintiffs do not dispute that the § 1503(a) declaratory judgment mechanism is an adequate remedy for the two Siblings who live in the United States, Abedalhameed and Osama, to challenge the State Department's revocation of their passports. Because the INA provides an adequate remedy for the Massachusetts-based Siblings to pursue their claims in federal court, Abedalhameed and Osama's APA claims must be dismissed.

The INA provides a separate and more burdensome set of procedures to challenge the denial of a right or privilege of citizenship in federal court for individuals such as Abdellatif, Safa, and Sara, the three Siblings who live outside the United States.

Under § 1503(b), individuals *outside the United States* who have been denied a right of citizenship may apply to a U.S. consular or diplomatic officer in their country of residence for a certificate of identity to enter the United States and litigate their claim, which requires a showing that the application is made in good faith and has a substantial basis. If an application is denied, the petitioner may appeal the denial to the Secretary of State, and then in federal court. § 1503(b). If they obtain a certificate, the individual must travel to and apply for admission at a U.S. port of entry, where they may be denied entry, detained, or subject to removal proceedings. § 1503(b)-(c). If they are allowed to enter the United States, they can then file a declaratory

judgment action under § 1503(a).  If the Attorney General makes a final determination denying the certificate holder admission into the United States, the only available appeal is by habeas corpus proceedings against the Attorney General. § 1503(c).

In *Rusk v. Cort*, the Supreme Court held that the certificate of identity procedure now codified at § 1503(b)-(c) was not an adequate remedy that precluded APA review for individuals outside the United States who have been denied a right of citizenship. 360 U.S. 367, 379-80 (1962) (*abrogated in part on other grounds*).  Unlike the Abuhajeb Siblings, Cort, who was living in Prague, was born in the United States, had been criminally indicted here, and faced arrest and pretrial confinement if he used the certificate of identity procedure to reenter the United States to challenge the separate administrative determination that he had forfeited his citizenship for evading military service. *Id.* at 375.  Building on *Cort*, several courts have found that § 1503's scheme for individuals outside the United States to litigate denial of citizenship rights is not adequate process under the APA. *See Gonzalez-Boisson v. Pompeo*, 2020 WL 2043889 at *5 (D.D.C. Apr. 28, 2020); *Chacoty v. Pompeo*, 392 F.Supp. 3d 1, 11-12 (D.D.C. 2019); *contra Hinojosa v. Horn*, 896 F.3d 305, 311 (5th Cir. 2018).

According to the Government, the Supreme Court's decision is limited to Cort's narrow circumstances because of the unique hardships he faced pursuing his claim under the INA if APA review was not allowed. (Docket No. 14 at 11).  But the Court's broad holding that "a person outside the United States who has been denied a right of citizenship is not confined to [the certificate of identity procedures]" does not require that the individual seeking remedies outside the INA face the threat of criminal prosecution or jail, or even substantial hardship. *Id*. at 379.  Setting aside the burdens that the Overseas Siblings allege they would face in prosecuting their claims under § 1503(b)-(c), reading a hardship requirement into the INA does not square

with *Cort*'s findings that Congress created the § 1503(b)-(c) certificate of identity mechanism to stop aliens from entering the county through "spurious citizenship claims," not to bar lawsuits by claimants like Cort —and the Overseas Siblings ——"who do not try to gain entry before prevailing in their claims to citizenship." *Id*.

I find that Plaintiffs have plausibly pled that 8 U.S.C. 1503(b)-(c) do not provide an adequate alternative remedy to judicial review under the APA, so the Overseas Siblings' APA claims survive if they have a plausible claim under the APA.  However, as discussed infra in my analysis of Count II, the Siblings have not stated a plausible claim to citizenship under the CCA, so the Overseas' Siblings APA claim is also dismissed.


<u>Count II: 8 U.S.C. 1503(a)</u>

Count II alleges that the State Department denied the Siblings a right or privilege of citizenship under 8 U.S.C. § 1503(a) when it revoked their passports. (Comp. at ¶¶ 49-50, Docket No. 1). As a threshold issue, relief under 8 U.S.C. § 1503(a) is only available for persons who are "within the United States." Because Overseas Siblings Abdellatif, Safa, and Sara Abuhajeb are outside the United States, Comp. at ¶¶ 13-15, they are plainly not entitled to relief under § 1503(a).  Accordingly, the Overseas Siblings' 8 U.S.C. § 1503(a) claims are dismissed.

Abedalhameed and Osama reside in Massachusetts ("Massachusetts Siblings") and may pursue a declaratory judgment action under § 1503(a) so long as they have a plausible claim to citizenship under the CCA that entitles them to hold the passports which the State Department revoked. The Government contends that even though the Massachusetts Siblings have standing to sue under §1503(a), they have no plausible claim to citizenship—and thus to hold passports—because they were not "residing" in the United States when they applied for and received their passports in 2005, as the CCA requires.

As an initial matter, the Government's legal argument relies on statutory interpretation of the INA itself, as well as the State Department's 2013 Cable and relevant FAM provisions on how consular officers should apply the CCA's residency requirement.  Since neither the Cable nor the FAM were issued through a notice-and-comment rulemaking process, their interpretation of the CCA's residence requirement is not owed *Chevron*-style deference.  *See Christensen v. Harris County*, 520 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-style deference.").  I will therefore look to the INA itself to ascertain the meaning of the CCA's residency requirement, and whether the Siblings have stated a plausible claim that they satisfied it.

The INA defines "residence" as "the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent." 8 U.S.C § 1101(33).  Notably, the statute distinguishes between "residence" and mere "physical presence" requirements when determining how groups of differently situated foreign-born children of U.S. citizens may obtain citizenship.[3]

---

[3] Under 8 U.S.C. § 1431(a) (the CCA), foreign-born children of a U.S. citizen automatically become citizens when the child *is residing* in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence (or did reside there at any point before their eighteenth birthday). Under 8 U.S.C. § 1401(c), foreign-born children whose parents are both U.S. citizens are citizens at birth so long as at least one parent has had *a residence* in the United States prior to the child's birth. Under 8 U.S.C. § 1401(g), a child born abroad to at least one U.S. citizen parent is a citizen at birth if the U.S. citizen parent was *physically present* in the United States for a period or periods of at least five years before the child's birth (at least two of the periods must be after the citizen parent reached the age of 14). These three statutes demonstrate that Congress distinguishes between physical presence and residence when setting requirements for foreign-born children to attain citizenship, and that the two terms are not synonymous. § 1401(g) is not a pathway to citizenship for the Siblings because they were all born before their father's naturalization.

"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23, (1983).  If Congress intended to deem any child of a U.S. citizen who is a legal permanent resident and who is physically present in the United States a U.S. citizen, it could have done so by using the term *physical presence* instead of *residing*.  Instead of a mere physical presence requirement, Congress chose to require that the child must be residing in the United States or have resided there at some point before their eighteenth birthday to derive automatic citizenship from their citizen parent.

In *Chacoty v. Pompeo*, the U.S. District Court for the District of Columbia considered whether a child had acquired U.S. citizenship under 8 U.S.C. § 1401(c), a similar INA derivative citizenship provision that confers citizenship at birth to foreign-born children so long as at least one of their two citizen-parents has had "a residence" in the United States before the child's birth.  *Chacoty v. Pompeo*, 392 F.Supp. 3d 1 (D.D.C. 2019).  There, the court found that by defining residence in the INA at 8 U.S.C. §1101(33) as a person's general abode and principal dwelling place, Congress intended more than physical presence; the citizen parent's residence in the United States must "eclipse" any other residence the citizenship-conferring parent may have also had at the time.  *Id*. at 17.

Plaintiffs argue that they were residing in the United States in 2005 within the meaning of the CCA "because noncitizens establish a lawful permanent 'residence' in the United States upon admission into the country as lawful permanent residents." (Docket No. 19 at 9).  But a plain reading of the CCA does not support this interpretation—if Plaintiffs are correct that a child is deemed to be residing in the United States within the meaning of § (a)(3) of the CCA because

they had been admitted as a lawful permanent resident, then the CCA's additional requirement that the child is or has resided in the United States before their eighteenth birthday to derive citizenship would be redundant.  If Congress intended that a child with a citizen parent would become a citizen immediately upon admission to the United States as a legal permanent resident, then it would not have added an explicit residency requirement.

The only two cases the Siblings cite as support for their argument, *Matter of Huang* and *Landon*, do not support their interpretation of the CCA's residency requirement.  In *Huang*, which is not binding on this Court, the Bureau of Immigration Appeals held that a mother and her children had abandoned their status as lawful permanent residents by being absent from the United States for four years, except for brief 3-4 week visits each year, and could be barred from reentry.  *Huang*, 19 I. & N. Dec.  749, 757 (BIA 1988).  *Landon* held that a returning lawful permanent resident was deemed to have the same due process rights as "an alien continuously residing and physically present in the United States," when the Government sought to prevent their return.  *Landon v. Plascencia*, 459 U.S. 21, 33 (1982).  These cases would be applicable if the United States sought to prevent the Siblings from returning to the United States for abandoning their legal permanent residency status, but they are not applicable when determining whether the Siblings established residency before they turned eighteen under the CCA.

I find the reasoning in *Chacoty* persuasive. Adopting the definition of residence set out in the INA and applied in *Chacoty*, the Massachusetts Siblings' § 1503(a) claims survive if they have a plausible claim that the United States was their principle, actual dwelling place in 2005.

The Siblings have not alleged any facts in their Complaint to state a claim that the United States was their principle, actual dwelling place for the fifteen days they remained here in 2005. By their own admission, they were born and raised in Jordan, returned to Jordan after their short

stay in Massachusetts, and did not return to the United States for any period of time before the age of 18.  The Complaint says nothing more about their 2005 visit other than that they applied for passports four days after arriving.  Based on such scant facts, the Siblings have not plausibly argued that Jordan did not remain their principle dwelling place during their brief visit here.

Because the Overseas Siblings have no standing under the section of the statute specified in the Complaint and because the Massachusetts Siblings have standing but Siblings have not pleaded any other instances in which they established a residence in the United States before they reached the age of 18 that would otherwise state a plausible claim to citizenship under the CCA, the Defendants' motion to dismiss the Siblings' 8 U.S.C. § 1503(a) claims is granted.

### The Siblings' Constitutional Claims
#### Count III: Due Process (Fifth Amendment)

The Due Process Clause contains both procedural and substantive elements. *DePoutot v. Rafaelly*, 424 F.3d 112, 118 (1st Cir. 2005). Substantive due process provides "heightened protection against government interference" with "those fundamental rights which are deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997).

The Siblings claim that the State Department's decision to revoke their passports violated their substantive due process rights to return home, reside in the United States, and to interstate travel. (Docket No. 19 at 13).[4]  Courts assessing substantive due process claims must ask

---

[4] Revocation of a passport is not revocation of citizenship.  8 U.S.C. § 1504(a).  Therefore, the constitutional claims do not include the Siblings' being stripped of citizenship but are limited to being stripped of one type of proof citizenship—their passports.  The Complaint alleges that the revocation violated the Siblings' substantive and procedural due process rights, but the opposition to the motion to dismiss only raises the Siblings' substantive due process rights.  (*See* Docket No. 19 at 13-14).

14

"whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998).  Conduct "intended to injure in some way unjustifiable by any government interest" is much more likely to support a substantive due process claim" than "deliberate decisions of government officials to deprive a person of life, liberty, or property." *Aguilar v. U.S. Immigration and Customs Enforcement*, 510 F. 3d 1, 21-22 (1st Cir. 2007).

The Siblings allege that the revocation of their passports — fourteen years after receiving them—was conscious-shocking, and the Court does not minimize the impact of the revocation on the Siblings and their families.  Indeed, the Siblings face permanent separation if they cannot obtain passports to travel internationally, and the Siblings' spouses and any foreign-born children who derived their citizenship based on the Siblings' statuses also face the sudden deprivation of their rights and privileges as U.S. citizens if they cannot prove they are citizens without passports. According to the Plaintiffs, all the Siblings have travelled, worked, paid taxes, and voted in the United States since 2005.  (Docket No. 19 at 1).  Abedalhameed and Osama, the Massachusetts Siblings, face uncertainty about their immigration status and right to work and remain in the United States. (Comp. at ¶¶ 42-44).

While the Supreme Court has recognized that the right to interstate travel is "virtually unqualified," the right to travel internationally is "no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment." *Haig v. Agee*, 453 U.S. 280, 307 (1981).  Restrictions on the liberty interest in travelling internationally can be regulated within the bounds of due process, while restrictions on interstate travel are subject to strict scrutiny. *Id*. at 306.  The Siblings do not cite case law to support their claim that citizens outside the United

States have a substantive due process right under the Fifth Amendment to return home that is equally protected, so the Court applies rational basis review rather than strict scrutiny review.

Assuming *arguendo* that the revocations were conscious-shocking, the Siblings have not stated a plausible claim that the Department's actions violated due process, which is all that is required when state action implicates the "right" to international travel.  The Siblings have not plausibly shown that there is no "'reasonable fit' between governmental purpose . . . and the means chosen to advance that purpose." *Reno v. Flores*, 507 U.S. 292, 305 (1993).  The Government has a cognizable interest in ensuring that passports are only issued to individuals who are lawfully entitled to travel from and to the United States which is reasonably related to allowing the State Department to revoke erroneously issued passports. To further that interest, Congress has authorized the State Department to revoke U.S. passports when it suspects they may have been erroneously issued and provided a mechanism for appeal, which the Siblings were offered.  22 C.F.R. 51.62(A)(2); 51.70-74.  When Sara and Abdellatif visited the U.S. Embassy in Jordan to obtain passports or proof of citizenship for their children, the consular officer reviewed the Siblings' immigration file and presumably realized that the Siblings were not entitled to hold U.S. passports, and revoked those passports, and provided the Siblings an opportunity to appeal, as required by law.  These actions comply with the Siblings' substantive due process rights to interstate travel.  Accordingly, Defendants' motion to dismiss the Plaintiffs' Due Process claim is granted.

<u>Count IV: Establishment Clause (First Amendment) and Count V: Equal Protection (Fifth Amendment)</u>

The First Amendment requires "governmental neutrality between religion and religion, and between religion and non religion." *McCreary County, Ky. v. American Civil Liberties*

*Union of Ky.*, 545 U.S. 844, 860 (2005), while the Fifth Amendment Due Process Clause incorporates the equal protection principles of the Fourteenth Amendment, which bars the government from discrimination on the basis of race or national origin.

To establish an Equal Protection claim, the Siblings must allege facts showing that: "(1) the person, compared with others similarly situated, was selectively restricted; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Davis v. Coakley*, 802 F.3d 132-33 (1st Cir. 2012).  To establish a First Amendment claim, at a minimum, a plaintiff must credibly allege that the challenged action either lacks a secular purpose, has a primary effect which advances or inhibits religion, or fosters excessive entanglement with religion to state an Establishment Clause claim. *Lemon v. Kurtzman*, 403 U.S. 602 (1971).

The Siblings argue that President Trump's statements during his 2016 campaign and administration, the series of executive orders barring immigrants from mostly Muslim-majority countries from entering the United States, and the State Department's corresponding actions revoking their passports in August 2019 demonstrate that they were the targets of a new "deliberate revocation policy" based on their race and religion. (Docket No. 19 at 16).

First, they point to President Trump's statements and actions about Muslim and non-white immigrants during his candidacy and his administration.  During the campaign, then-candidate Trump called for a "total and complete shutdown of all Muslims entering the United States."[5]  After his election, he issued an executive order suspending immigrant visas from Iran,

---

[5] Jenna Johnson, *Trump Calls for "Total and Complete Shutdown of Muslims Entering the United States,"* Washington Post (Dec. 7, 2015), https://www.washingtonpost.com/news/post-

Iraq, Suria, Sudan, Libya, Yemen, and Somalia in order to "protect [U.S.] citizens from foreign nationals who intend to commit terrorist attacks in the United States; and to prevent the admission of foreign nationals who intend to exploit United States immigration laws for malevolent purposes."  E.O. 13769, 82 F.R. 8977 (Jan. 27, 2017).[6]   In addition to the travel ban and its progeny, the President initiated "extreme vetting" during visa adjudications and increased funding for the federal government to investigate and bring denaturalization cases against U.S. citizens. Amanda Frost, *Alienating Citizens*, 114 N.W. U. L. REV. ONLINE 48, 152-53 (2019); Donald J. Trump, Jun. 5, 2017 (Twitter).

Second, the Siblings allege that to execute the President's intent to discriminate against non-white and Muslim immigrants, the consular officers who revoked the Siblings' passports and conducted Abdellatif's administrative hearing in 2019 departed from established State Department practice. According to Plaintiffs, at the time the passports were revoked, the Foreign Affairs Manual ("FAM") did not state any minimum period of time a child must remain in the United States to derive citizenship from a citizen parent under the CCA.  (Comp. ¶ 27).  It also advised consular officers: "NOTE: As U.S. citizens [the children] are not required to remain in the United States for any specified period of time in order to retain the citizenship they acquired under INA Section 320." (¶ 27).

---

politics/wp/2015/12/07/donald-trump-calls-for-total-and-complete-shutdown-of-muslims-entering-the-united-states/.

[6] The Supreme Court upheld a partial stay of E.O. 13769 but did not review the Fourth and Ninth Circuit's findings that the travel ban likely violated the Establishment Clause on the merits because the President issued a subsequent, revised order making the case moot. *Trump v. Hawaii*, 138 S.Ct. 37 (Oct. 24, 2017). The Court later upheld a third version of the travel ban which included additional, non-Muslim majority nations.  *Trump v. Hawaii*, 138 S.Ct. 2392 (2018).

The Siblings also point out that the State Department had renewed their passports without incident until the Trump Administration, and that the officers reviewing Sara's request to obtain passports for her U.S.-born children had no reason to review her status, or the statuses of her four siblings, in August 2019.  Abdellatif claims that the consular officer in Jordan reviewing his case, Kelly M. McCullum, told him that "many other people were in the same situation, i.e., had their passports revoked."  (¶ 13).

The Equal Protection Clause and Establishment Clause claims both fail.  Even if the Siblings have alleged circumstantial evidence of President Trump's discriminatory intent, they have not alleged how that intent motivated the State Department's decision to revoke their passports.  The 2017 Travel Ban and extreme vetting for immigrant visa applicants program allege discriminatory intent against Muslim and non-white immigrants, but not U.S. passport holders in the Siblings' positions. The Department of Justice's increase in denaturalization cases may implicate the Siblings, but the government has not moved to strip their citizenship in the past year since revoking their passports.  Furthermore, there is no evidence that the State Department departed from its established procedure in the FAM when it revoked their passports, as the Siblings claim, because the version of the FAM that was in force at that time advised consular officers to consider the duration and character of a claimant's stay for purposes of determining residency within the meaning of the CCA.

The Siblings do not allege any facial discrimination in the statutes which authorize the State Department to revoke passports. They do not allege that they were treated differently than similarly situated U.S. passport holders from different racial or ethnic backgrounds who attained citizenship based on the CCA seeking to renew their passports. The consular officer's statement to Abdellatif that she had noticed a pattern of passport stripping at the U.S. Embassy in Jordan,

where presumably many of the passport holders were of Middle Eastern descent or identified as Muslim, alleges a rise in passport stripping, but is not enough without accompanying evidence that the increase was only among Muslim or Middle Eastern populations. Something more is needed to establish a plausible connection between the alleged intent to discriminate against Muslims or individuals of Jordanian national origin or race and the Siblings' passport revocation.

Discriminatory intent might be sufficiently alleged if there was no other likely explanation for the consulate staff's decision to revoke the passports. But reading the Siblings' selected provisions of the FAM that were in place in 2019 in the most favorable light (when the alleged discrimination took place) does not credibly show that the State Department's customary practice was to confer automatic citizenship on foreign-born children of U.S. citizens as soon as they are admitted to the United States as legal permanent residents.  Therefore, the Court cannot infer that the decision to revoke the passports was an intentional deviation from established procedure.

The FAM provisions emphasized by the Siblings state that there is no minimum or specific period of time a child must remain in the United States to derive citizenship before the age of eighteen. This guidance is not incompatible with the other provisions in the FAM advising consular officers to consider the character and duration of the stay of a person claiming citizenship based upon the CCA, or the CCA requirement that the claimant be found to be "residing" in the United States, or have resided there before their eighteenth birthday, in order to automatically attain citizenship.  Far from changing their longstanding practices to strip the Siblings of their passports in 2019, the State Department issued the 2013 Cable laying out how to determine residency for the purposes for the CCA to all diplomatic and consular posts six years

earlier, during the Obama Administration. (Docket No. 14, Ex. A).  Defendants' motion to dismiss the First and Fifth Amendment claims is granted.

## Count VI: Equitable Estoppel

Because the Siblings have not established a plausible claim that their passports were wrongfully revoked in violation of federal law or the U.S. Constitution, they are not entitled to the equitable relief sought, which includes a court order declaring them to be citizens and ordering the State Department to return their passports.  Accordingly, the Government's motion to dismiss Count VI for equitable estoppel is dismissed.

## Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss (Docket No. 13) is *granted*.

**SO ORDERED.**

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**
